Filed 3/9/21  In re M.M. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re M.M., A Person Coming Under Juvenile Court Law. | B306682 |
| _____ LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. DEBRA M., Defendant and Appellant. | (Los Angeles County Super. Ct. No. 17LJJP00156B) |

APPEAL from an order of the Superior Court of Los Angeles County, Nichelle Blackwell, Juvenile Court Referee. Affirmed.

Erin Riley Khorram, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Mother D.M. appeals from the dispositional order following the adjudication of her then two-year-old son, M.M. (child) as a dependent child. Specifically, she contends the court erred in removing her son from her custody because reasonable means existed to protect him without removing him from her home. She further contends the court erred in finding the Department of Children and Family Services (the Department) had made reasonable efforts to avoid removal. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Prior Services

Child was born in September 2017, when mother was 19 years old. Mother was herself a dependent, and was still receiving services. Those services would continue until she turned 21 in January 2019.

In October 2017, the Department received a referral alleging physical abuse and general neglect. The abuse allegation was unfounded, but the general neglect was substantiated.[1] A non-detained dependency case was opened. In February 2018, the petition was dismissed without prejudice due to mother agreeing to a voluntary family maintenance contract with the Department, with the goal of keeping child in her home. (Welf. & Inst. Code, § 301.)[2] Mother participated in counseling and random drug testing. She tested negative, although she

---

[1] The allegation involved mother leaving her placement with the child for a number of days. Upon her return, mother's behavior "began to escalate" and, while holding her newborn, she threatened to punch the caregiver and threatened other adults in the home.

[2] All further undesignated statutory references are to the Welfare & Institutions Code.

missed some tests.  The family maintenance contract ended on July 25, 2018.

**2.    *The April 30, 2020 Incident***

The current case brought child to the attention of the Department when mother and child found themselves in the middle of a drug deal.

On April 30, 2020, police planned a controlled buy of cocaine base in an area known for high narcotics activity.  They used an informant as the purchaser.  The purchaser met with a man (referred to in the police report as Suspect 2) at an intersection and told him he wanted to buy rock cocaine.  Suspect 2 entered the informant's vehicle and directed him to another intersection some distance away.  There, the informant gave Suspect 2 predesignated buy money.  Suspect 2 exited the car and placed a call.  Thereafter, another vehicle, driven by Suspect 1, pulled up.  Suspect 1 exited the car and met Suspect 2.  Suspect 2 handed Suspect 1 the cash.  As Suspect 1 was handing Suspect 2 the cocaine base, police converged.  Both suspects were arrested without incident.

Police found mother and child in the back seat of Suspect 1's car.  A dozen liquor bottles, with security devices attached (consistent with the bottles being stolen) were next to mother.  Child was not in a car seat.

Mother was "irate and chaotic when law enforcement asked her to step out of the vehicle.  She was making growling sounds and screaming noises, and was not responsive to law enforcement."  Mother resisted and the officers "utilized use of force strategy" against her.  A social worker from the Department's Multi-Agency Response Team, CSW Diego Lopez, was called to the scene.  Prior to interviewing mother, Lopez

"observed the mother to need about five minutes to gather herself as she was growling and screaming loudly." Mother eventually calmed.

When asked to explain her presence at the scene, she said she had met Suspect 1 at the grocery store a couple days ago, and had asked him for a ride to the store. She denied any awareness of criminal activity and said she did not even know his name. When asked about the lack of car seat, she said she did not think much of it because " 'we only came down the street.' " CSW Lopez reminded her of the importance of a car seat and mother agreed, expressing remorse and promising to comply with the law in the future.

When asked about drug use, mother reported that she used marijuana weekly. CSW Lopez asked if she would drug test to rule out the use of any illicit substances, and mother agreed; she also stated that she may test positive for methamphetamine, as she had used last weekend when out "with some friends she met on the streets." She denied using drugs in the presence of her child, explaining that when she had used methamphetamine, child was cared for by a friend at mother's transitional home.[3] Mother has no family she can turn to for support. Child's father has been identified by first name only. He is not a presence in child's life nor a party to this appeal.

Law enforcement took mother and child home. CSW Lopez conducted a home assessment; there were no concerns regarding safety in the home. Lopez also believed the child was healthy and safe.

---

[3]     Mother lived in a home for low income mothers and their children. She reported that times had been difficult and she did not work. Mother's criminal history includes prostitution.

Mother drug tested the next day, May 1, 2020.  She was positive for methamphetamine, amphetamine, and marijuana.

**3.**     *Detention*

On May 6, 2020, CSW Lopez filed an application for an authorization for removal.  An order was obtained and child was detained the next day.

**4.**     *Petition*

On May 11, 2020, the Department filed a petition to declare child a dependent under section 300, subdivision (b).[4]  Two paragraphs were alleged to support dependency.  Ultimately, the first would be sustained and the second dismissed.[5]

The sustained first paragraph alleged mother "has a history of substance abuse and is a current abuser of methamphetamines, amphetamines, and marijuana, which renders the mother incapable of providing regular care and supervision of the child.  On 05/01/2020, the mother had a

---

[4]     This provides a child may be adjudicated dependent if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's . . . substance abuse."

[5]     The dismissed paragraph was solely directed to the April 30, 2020 incident, not the broader question of mother's substance abuse and her inability to care for child.  It alleged that mother put child in a "detrimental and endangering situation in that cocaine base and 12 bottles of alcohol were found in a vehicle with the child" and also that he was not secured in a car seat.  The court did not find this allegation untrue; it simply found insufficient evidence that there was a current risk to child sufficient for jurisdiction based on this allegation.

5

positive toxicology screen for amphetamines, methamphetamines, and marijuana. The child is of such young age requiring constant care and supervision and the mother's substance abuse interferes with providing regular care and supervision of the child. The mother's substance abuse endangers the child's physical health and safety and places the child at risk of serious physical harm, damage and danger."

At the May 14, 2020 detention hearing, the court directed the Department to provide mother with all appropriate low and no cost referrals for services. The court specifically stated, "Those referrals to include a testing referral with result in the next report." CSW Lopez had indicated in his detention report that referrals for parenting, individual counseling, substance abuse, and random drug testing had already been provided to mother. The matter was set for an adjudication/disposition hearing

**5. *Progress Before the Adjudication/Disposition Hearing***

Mother had a number of drug tests between the May 14, 2020 detention hearing and the July 8, 2020 adjudication hearing. Mother did not test positive for methamphetamine or amphetamine after her first, May 1, 2020, on-demand test. However, she had two missed tests. In addition, her drug tests indicated that she continued using marijuana.[6]

Her test results were:

| Date | Marijuana metabolites |
| --- | --- |

---

[6] On appeal, mother asserts that her "test results showed a general trend toward reduced amounts of marijuana present in her system." On the contrary, the numbers twice increased from their last reported value, indicating that mother used marijuana at least twice during this period – once before May 22 and once before June 18.

| May 1, 2020 | 899 NG/ml |
|---|---|
| May 22, 2020 | >4000 NG/ml |
| May 28, 2020 | No show |
| June 4, 2020 | 76 NG/ml |
| June 9, 2020 | No show |
| June 18, 2020 | 626 NG/ml |
| June 25, 2020 | 174 NG/ml |

(move this to left) Mother also began individual counseling; she had three sessions and appeared motivated and cooperative. She had also enrolled in parenting. Mother had not yet enrolled in substance abuse treatment; she would testify that she was placed on a waiting list.

### 6. *The Department's Report for the Adjudication/Disposition Hearing*

The Department's report for the Adjudication/Disposition hearing contained further statements from mother regarding her drug use and how it impacted child. Mother admitted that, before child was born, she was using methamphetamine " 'on and off.' " She denied being a current user of methamphetamine, and claimed that she had simply used once when " 'hanging out' " with friends. She again said she left child with a friend at home when she used, but was "not able to provide the name or contact information of the friend that provided care and supervision" for the child.[7]

Mother admitted that she used to smoke marijuana " 'all the time,' " but claimed to have recently stopped using because

---

[7] Mother did identify a friend as her support system, but did not identify her as the person who cared for child when she was using methamphetamine.

she wanted to focus on education, employment, and reunifying with her child. "Mother stated that she feels that she is receiving resources from the Department and does not need to smoke Marijuana at this time." Mother wanted to begin training to become a security guard, so needed to stop using marijuana.

As to what brought her and child to be in the backseat of a car during a drug deal, mother claimed that she had been running out of milk for child and called her friend for a ride to the store so she could buy more. She claimed she was unaware of the alcohol in the vehicle. She also regretted not using a car seat and requested Department assistance in obtaining one. She accepted that she needs to make better decisions for her son's safety.

## 7. *The Adjudication/Disposition Hearing*

The combined Adjudication/Disposition hearing was held on July 8, 2020.

As to jurisdiction, mother's counsel conceded the case was about "a mother who needs help and is willing to get help and acknowledges her use of drugs." There were no witnesses on the issue of jurisdiction, and the court found child dependent under section 300, subdivision (b), based on mother's drug abuse, as alleged in the first paragraph of the petition. The court found that "mother has a substance abuse problem" and stated, "I do believe that the mother's current use of methamphetamine and getting into a car with individuals who had stolen merchandise and possibly engaging in narcotics sales, individuals who she has known for only two days, by her own statements, indicates mother is making bad choices and bad decisions, possibly because of her methamphetamine use."

The court then turned to disposition, and heard evidence on whether removing child from mother was necessary. Mother

submitted a letter confirming that she had started individual counseling and also testified herself. She called as a witness the Department's Dependency Investigator (DI) Sonia Sandoval.

DI Sandoval was called, in part, in order to support mother's argument that the Department had not provided mother with the necessary referrals. Sandoval testified that she did not provide mother with referrals because CSW Lopez already had. Mother did not call Lopez to testify.

DI Sandoval also testified that the Department had considered whether to recommend keeping child in mother's home supported by family preservation services. The Department declined to do so because of the following circumstances: (1) mother's ongoing marijuana use; (2) the Department's inability to identify, and therefore assess, anyone who allegedly cared for child while mother was under the influence; (3) mother's recent use of methamphetamine; (4) mother's missed drug tests; (5) mother's previous participation in a program with substance abuse treatment; (6) child's tender years; (7) mother's lack of a support system; (8) mother's lack of current participation in a substance abuse program; and (9) mother's lack of stable housing.

Mother testified that she had been trying to get into a substance abuse program but was initially placed on a waiting list. She asserted that she was presently being assessed for a program which she had found on her own.

The trial court reasonably found mother's testimony regarding drug testing implausible. Mother claimed that she had never missed a test and called every day to make sure her letter was not called. She asserted that on June 25 – less than two weeks before the hearing – she had been changed from random

9

testing to weekly testing. When asked when she last used marijuana, she said it was "[a] month and a half ago, the day they switched" the testing schedule.[8]

Mother's counsel argued for placement of child in mother's home with services. Counsel argued that mother was willing to do programs and had done everything she could to enroll, even without the Department's assistance. Counsel argued that there was only one positive drug test for methamphetamine, and mother had stopped using marijuana, as decreasing levels confirmed. Mother's counsel specifically requested the court find that reasonable services to prevent removal had not been provided.

The trial court concluded that removal was necessary. Although the court did not accept all the reasons offered by the Department, the court found that mother's drug use created too great a risk to child. The court recognized that, although marijuana is legal, "if someone is using it and under the influence of it, they need to not be caring for their child, especially a two-year-old child." The court stated that mother "stated some random person at her transitional housing was caring for the child, but she failed to give a name so I find that to be dishonest and lacking in credibility to this court."

The court also cited mother's recent use of methamphetamine. The court stated that it appeared that mother was under the influence of methamphetamine when the arrest was made. The court was particularly concerned that mother's

---

[8]     After testimony closed and counsel was arguing, mother attempted to volunteer that she had made a mistake and the date of the change was actually "the 15th." Even June 15 was not a month and a half prior to the July 8 hearing.

10

methamphetamine use "impacted mother's ability to make the right judgment" such as whether to "get in a car with a two year old without a car seat, with someone she had known for only two days, noting that there were bottles of alcohol with a security tag still on them right next to her in the car."  An additional basis for the court's ruling was mother's missed and positive drug tests, including those showing increases in her marijuana metabolites.

The court summed up its dispositional findings, "This is a young child of tender years and it is important to see that the mother has control over her addiction.  [¶]  This addiction will not just go away.  One has to exercise the proper tools, the proper techniques, the proper relapse prevention skills to avoid relapse, and that means not being in an environment with drug users, drug abusers or drug dealers and maintain a sober life-style and a sober environment."  The court found clear and convincing evidence existed that returning child would pose a substantial risk of detriment and no reasonable means then existed to protect him other than removal.

The court also found the Department made reasonable efforts to avoid removal.

Mother was granted monitored visitation and reunification services.  Mother filed a timely notice of appeal.

### DISCUSSION

On appeal, mother does not contest the court's finding of jurisdiction, but challenges the court's dispositional order to the extent the dependency court did not return child to her custody.  Specifically, mother argues reasonable means existed to protect child in her home, via family preservation services.  In addition, mother argues the Department did not make reasonable efforts to prevent removal.

11

### 1.      *Sufficient Evidence Supports Child's Removal*

"Before the court may order a child physically removed from his or her parent, it must find, by clear and convincing evidence, that the child would be at substantial risk of harm if returned home and that there are no reasonable means by which the child can be protected without removal.  [Citations.]" (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.)  "The parent need not be dangerous and the child need not have been actually harmed for removal to be appropriate.  The focus of the statute is on averting harm to the child.  [Citations.]  In this regard, the court may consider the parent's past conduct as well as present circumstances.  [Citation.]" (*Ibid.*)

We review the court's disposition finding for substantial evidence.  (*In re Henry V.* (2004) 119 Cal.App.4th 522, 529.)  Because the trial court's finding must itself be made on clear and convincing evidence, we must take that heightened standard into account in our review.  (*In re V.L.* (2020) 54 Cal.App.5th 147, 155.)  Specifically " '[W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.  Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence.' " (*Ibid.*, quoting *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996.)

12

Here, the trial court concluded mother's unresolved substance abuse rendered it unsafe for child to be returned home.[9] This was supported by substantial evidence. Mother admitted using methamphetamine before child was born and smoking marijuana weekly during his life. Her previous family maintenance services included drug testing, confirming that drugs played a role in the prior neglect allegations. That she tested negative at the time, albeit with missed tests, showed that mother was able to restrain her drug use to some degree. But that she relapsed into regular marijuana use and at least one incident of methamphetamine use evidenced that she was not stable in sobriety.

Mother's drug use presented a risk of harm to the child in the absence of an identified safe caretaker who could supervise the child when mother used, and was under the influence of, drugs. She could not identify the person with whom she left child when she used methamphetamine; and, more importantly, she had the child in her sole supervision when she was still impaired by methamphetamine, resulting in her admittedly bad choices which placed the child at risk.

---

[9] In her reply brief on appeal, mother suggests the evidence only supports a finding that she "used," drugs, not that she "abused" them. This argument would go to the jurisdictional finding, which mother did not contest in her opening brief. Jurisdiction under section 300, subdivision (b) is based on substance abuse, not substance use. (*In re Drake M.,* (2012) 211 Cal.App.4th 754, 764.) In any event, the findings that we affirm with regard to the risk to child presented by mother's methamphetamine and marijuana use likewise support the court's jurisdictional finding of substance abuse.

On appeal, Mother suggests that "by the time of the jurisdiction and disposition hearing, the immediate risks the court identified that resulted from mother's poor decision-making had been addressed." She notes, in this regard, that she (1) sought Department assistance in obtaining a car seat; (2) was no longer associating with the drug-dealing suspects; (3) was cooperating with the Department; and (4) had located a drug program and put her name on the waitlist. Notably absent from her list is any suggestion that she had stopped using drugs. Indeed, she had not. Of her six drug tests following child's initial detention, two showed an increase in marijuana metabolites and two were no shows.[10] While mother claimed to have stopped using marijuana a few weeks prior to the adjudication/disposition hearing, this short sobriety is insufficient to demonstrate that the risk had been abated.

Increased Department supervision could not protect child in mother's home at this point. Given mother's history of drug abuse, the court could not safely return child to mother's custody without a lengthier term of sobriety. There was simply no evidence that mother would not again attempt to care for her toddler while under the influence of drugs.

---

[10]    In her brief on appeal, mother states, "Mother acknowledges she missed two opportunities to drug test, which she had undertaken to do, voluntarily." She then suggests this should not "weigh heavily against her" as the tests were not then court-ordered. Mother's acknowledgement of the missed tests on appeal is in direct contrast to her testimony at the hearing, when, having been given an opportunity to explain why she missed two tests, she simply denied having missed them. Mother's appellate concession is, in effect, an admission that she was not truthful in her testimony at the disposition hearing.

14

**2.**    ***Substantial Evidence Supports the Court's Finding Reasonable Efforts Were Made to Prevent Removal***

The juvenile court is required to make a determination whether reasonable efforts were made to eliminate the need for removal.  (§ 361, subd. (e).)  The trial court made a finding that reasonable efforts had been made, but did not specify those efforts beyond stating the Department has evidenced reasonable efforts "by repeated efforts and services they've offered mother."

"We review a reasonable services finding to determine if it is supported by substantial evidence.  [Citation.]"  (*In re A.G.* (2017) 12 Cal.App.5th 994, 1001.)  Substantial evidence supports the court's finding.  CSW Lopez provided mother with low or no cost referrals to parenting, individual counseling, substance abuse, and random drug testing.  Indeed, prior to the adjudication/disposition hearing, mother told DI Sandoval "that she feels that she is receiving resources from the Department and does not need to smoke Marijuana at this time."

### DISPOSITION

The disposition order is affirmed.


                                                            RUBIN, P. J.

WE CONCUR:



        MOOR, J.



        KIM, J.

15